AMERICAN ACCEPTANCE
CORPORATION

v.

ELMER G. GIBBONS, III, INC., Professional Law Corporation, et al.

No. 84–4862.

United States District Court,
E.D. Louisiana.

Sept. 30, 1988.

On Motion for New Trial or to Amend
the Judgment Dec. 30, 1988.

A.D. Freeman, Satterlee, Mestayer & Freeman, New Orleans, La., for plaintiff, Scott Housing Systems, Inc.

Robert N. Ryan, Bienvenu, Foster, Ryan & O'Bannon, New Orleans, La., for defendants, Elmer G. Gibbons, III, Inc., Elmer G. Gibbons, III and Imperial Cas. & Indem. Co.

## MEMORANDUM OPINION

MENTZ, District Judge.

This is an action for legal malpractice commenced by American Acceptance Corporation against its attorney, Elmer Gibbons, III, his professional law corporation, and his insurer, Imperial Casualty & Indemnity Company. Scott Housing Systems, Inc. was substituted as party plaintiff by American Acceptance Corporation. The action was tried to the Court without a jury on a prior date. Having reviewed the evidence, the memoranda of counsel, the record, and the law, the Court now renders its findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a). To the extent any findings of fact are conclusions of law, they are adopted as such; to the extent any conclusions of law are findings of fact, they are so adopted.

### FINDINGS OF FACT

#### I.

American Acceptance Corporation (AAC) is a financial institution which, at the request of Scott Housing Systems, Inc. (Scott), provided floor plan financing to Luneau Mobile Homes, Inc. (Luneau), a mobile home dealer in the State of Louisiana, for Luneau's purchase of mobile homes manufactured by Scott.[1]

#### II.

As consideration for AAC's extending credit to Luneau, AAC and Scott entered into a buy back agreement dated March 7, 1983. This agreement provided that if Luneau defaulted on its loan from AAC, Scott would be unconditionally obligated to purchase the debt from AAC for the total amount unpaid on the loan, plus interest, costs, and attorneys fees.

#### III.

AAC also obtained security for the loan from Luneau. Before AAC paid a Scott invoice for a mobile home shipped to Luneau, AAC contacted its attorney, Elmer Gibbons, and requested that he prepare a collateral chattel mortgage by Luneau in favor of AAC on the mobile homes sold by Scott to Luneau.

---

1. The type of floor plan financing provided by AAC to Luneau on behalf of Scott is known as brand label financing. The product (a Scott mobile home unit) is invoiced to the dealer (Luneau), but title is sent to the finance company (AAC). The manufacturer (Scott) looks to the finance company as the owner. In addition, the manufacturer agrees to exercise a repurchase agreement in the event the dealer defaults on the loan from the finance company.

## IV.

On or about August 11, 1983, Mr. Gibbons prepared a collateral chattel mortgage by Luneau in favor of AAC in the sum of $1,750,000.00 encumbering "the masses or assemblages of present and future inventory ... manufactured ... by Scott Housing Systems, Inc. consisting of mobile homes...." For the same transaction, Mr. Gibbons prepared a promissory note dated August 11, 1983 in the amount of $1,750,-000.00 paraphed ne varietur with the collateral chattel mortgage dated August 11, 1983. Finally, Mr. Gibbons prepared an act of pledge dated August 11, 1983 wherein Luneau pledged to AAC the promissory note identified with the collateral chattel mortgage to secure Luneau's borrowing for the purchase of the mobile homes. The collateral chattel mortgage, the promissory note, and the act of pledge were signed by Luneau and AAC on August 11, 1983. Mr. Gibbons filed the collateral chattel mortgage in the parishes in Louisiana where the mobile homes were located but did not file it with the Department of Public Safety, Office of Motor Vehicles, as required by La.R.S. 32:710, as amended by Acts 1975, No. 409, to assert AAC's lien on the mobile homes against third parties.

## V.

In January, 1984, some Luneau checks were returned to AAC for insufficient funds. AAC became concerned about the financial stability of Luneau and contacted Mr. Gibbons to discuss additional security devices that would ensure AAC's right to repossess the homes in the event Luneau fully defaulted and AAC wanted to call the loan. On the advice of Mr. Gibbons, AAC had Mr. Gibbons draft a Louisiana sale and mortgage executed on February 7, 1984 whereby AAC sold the mobile homes to Luneau for the sum of $671,456.00, the amount of Luneau's outstanding debt to AAC. In return, Luneau executed a promissory note in the amount of $671,456.00 in favor of AAC. The Louisiana sale and mortgage also provided that Luneau mortgaged to AAC the mobile homes sold by AAC to Luneau. Finally, the Louisiana sale and mortgage stated that "Seller [AAC] does hereby expressly reserve the vendor's lien and privilege upon said property...." Like the collateral chattel mortgage, the Louisiana sale and mortgage was filed in the parishes where the mobile homes were located but was not filed with the Louisiana Department of Public Safety, Office of Motor Vehicles, as is required to preserve its rank against third parties. *See* La.R.S. 32:710.

## VI.

Also on the advice of Mr. Gibbons, AAC had instituted a practice of obtaining a vendor's privilege from all mobile home dealers indebted to AAC in Louisiana. The evidence at trial showed that Scott had assigned to AAC Scott's vendor's privilege on its account with Guillory and Sons, another mobile home dealership owned by the Luneau Brothers. However, defendants did not produce any evidence at trial establishing that Scott assigned to AAC Scott's vendor's lien on the account with Luneau Mobile Homes, Inc. (Luneau). Defendants introduced two documents titled "Assignment of Vendor's Privilege" which were prepared by Mr. Gibbons and signed by Anna Mae Stumm, Assistant Vice President of AAC, on August 29, 1983 and November 8, 1983, respectively. However, as neither document was signed by the vendor, Scott, the assignment of the vendor's privilege was never perfected.

## VII.

About 1983 or 1984 Ms. Stumm noted in a professional periodical that the Louisiana legislature had passed a law that required the filing of documentation with the Louisiana Motor Vehicle Bureau. Ms. Stumm phoned Mr. Gibbons, asked him to review the statute, and requested that he advise as to whether the new law affected AAC's business and whether AAC should file the documents. Mr. Gibbons responded that the type of business AAC was engaged in was not affected by the statute. The statute Ms. Stumm and Mr. Gibbons discussed was not identified to the Court. However, the Court notes that in 1975 La.R.S. 32:710 regarding the execution and recordation of

chattel mortgages on motor vehicles was amended to include mobile homes. *See* Acts. 1975, No. 409. Further amendments to the statute were made in 1982 and 1983. *See* Acts 1982, No. 524, as amended in 1983.

## VIII.

Mr. Gibbons testified that at the time he recorded the collateral chattel mortgage and Louisiana sale and mortgage he did not know that La.R.S. 32:710 required that chattel mortgages on mobile homes be recorded with the Louisiana Department of Public Safety, Office of Motor Vehicles, to preserve its rank against third parties.

## IX.

Mr. Gibbons testified in his defense that he was never asked to obtain a first lien on the Luneau mobile homes. Yet, Ms. Stumm stated at her deposition that Mr. Gibbons was retained by AAC to prepare documents which would provide AAC with a first security interest on loans which are secured by liens on inventory in the State of Louisiana. It is the opinion of this Court that even if AAC never specifically requested that Mr. Gibbons draft and record documents in a manner which would secure for AAC a first lien on the movables, it is implicit that AAC desired the highest ranking lien on the mobile homes that could be obtained under the law.

## X.

ITT Commercial Finance Corporation (ITT) also extended credit to Luneau for the purchase of mobile homes manufactured and sold by Scott to Luneau. To secure this debt, ITT used floor plan financing similar to that used by AAC. Luneau executed two collateral chattel mortgages in favor of ITT. The first was dated June 30, 1983 and the second was dated December 12, 1983. Both mortgages encumbered mobile homes on Luneau lots and were filed with Louisiana Department of Public Safety, Office of Motor Vehicles. In addition, ITT and Scott signed a floor plan repurchase agreement dated November 11, 1983 wherein Scott agreed to repurchase the Scott mobile homes financed by ITT in the event of Luneau's default.

## XI.

In March, 1984, Luneau defaulted on its obligations to both AAC and ITT. Luneau's default on the AAC loan occurred on March 2, 1984. That same date Luneau authorized Scott to take all of the Scott mobile homes from Luneau's locations.

## XII.

On March 19, 1984, AAC filed suit against Scott in the United States District Court for the Eastern District of Pennsylvania to enforce the buy back agreement of March 7, 1983. Scott refused to repurchase the homes because AAC did not properly record its collateral chattel mortgage on the homes, enabling ITT to obtain a higher ranking lien. Judge Shapiro of that district ruled that under the terms of the buy back agreement Scott was unconditionally bound to pay AAC the full amount of Luneau's indebtedness. On December 6, 1985, the Court rendered a judgment in favor of AAC and against Scott in the sum of $887,458.67.

## XIII.

On February 1, 1986, AAC and Scott settled the Pennsylvania judgment. Scott agreed to pay AAC an immediate cash payment of $175,000.00 and to pay $400,000.00 at a later date. As an additional part of the settlement, AAC sold and transferred to Scott its claim for legal malpractice against Elmer Gibbons.

## XIV.

On April 18, 1984, one month after AAC filed suit against Scott in Pennsylvania, ITT filed a petition for executory process wherein it sought to have the mobile homes secured by its mortgages siezed and sold. *See ITT Commercial Finance Corp. v. Luneau Mobile Home Sales, Inc.,* Civil Action No. 84–1058 (W.D.La.). AAC intervened in the suit to assert a vendor's privilege which was allegedly assigned in its favor from Scott on the mobile homes Luneau pur-

chased from Scott.[2] AAC alleged that it had a superior lien on the Luneau's mobile home inventory because its vendor's privilege outranked the mortgages asserted by ITT. AAC claimed that the privilege could be lost if the mobile homes were sold, resulting in irreparable harm to AAC.

### XV.

By Court order, the mobile homes were seized on or about April 27, 1984 and a custodian was appointed to preserve the homes. On November 28, 1984, the United States Marshal at DeRidder, Louisiana offered the mobile homes for sale at a public auction. At the auction, fifteen of the homes were sold to Scott for $108,000.44, while forty-two others remained unsold. The remaining mobile homes were sold on January 30, 1985 to Kyte Brothers Mobile Homes for $220,200.00. The proceeds of both sales were placed into the registry of the Court pending the resolution of the ranking dispute between AAC and ITT.

### XVI.

Both AAC and ITT moved for partial summary judgment on the ranking issue, which motions were denied by Judge Veron of the Western District as there were genuine issues of material fact in dispute. On April 30, 1986, AAC and ITT entered into a settlement agreement which resolved all issues in the case. Pursuant thereto, AAC received $97,244.05 and ITT received the remainder of the funds realized from the Marshal's sale on all Luneau's mobile homes financed either by AAC or ITT.

### XVII.

On October 3, 1984, during the pendency of the Lake Charles and Pennsylvania litigation, AAC's new attorney, Mr. Smith of Deutch, Kerrigan and Stiles, filed with the Louisiana Department of Public Safety, Office of Motor Vehicles, AAC's August 11, 1983 collateral chattel mortgage in the amount of $1,750,000.00.

### XVIII.

However, in the interim, the following mortgages had already been recorded with the Louisiana Department of Public Safety, Office of Motor Vehicles, against Luneau:

|  | Date of Mortgage | Mortgage Amount | Date Filed | Date Cancelled |
|---|---|---|---|---|
| ITT Diversified Credit Corporation | 8–18–83 | $1,500,000 | 8–25–83 | |
| ITT Diversified Credit Corporation | 12–2–83 | $5,000,000 | 12–28–83 | |
| Finance America Private Brando, Inc. | 1–12–84 | $1,000,000 | 1–19–84 | |

### XIX.

Mr. Mike Cappaert, an expert in mobile home manufacturer, dealer, and wholesaler relations, testified that if AAC had been able to seize the homes when Luneau defaulted on March 2, 1984, it is probable that AAC would have sold the homes for within approximately ten percent of their value. Mr. Cappaert also testified that in March, 1984 he worked for Magnolia, another mobile home manufacturer, which had eighty-nine homes in Luneau's inventory at the time of Luneau's failure. Magnolia seized and sold all eighty-nine mobile homes via executory process within one month of the date of default. Magnolia sold most of the homes for a price which was within 90 to 100 percent of the full invoice value. Only on a few homes did Magnolia take, at maximum, a fifteen percent loss. Mr. Cappaert never entered the mobile homes on Luneau's lot and thus did not know whether Scott and Magnolia homes which were defaulted upon by Luneau were a similar grade. However, Mr. Cappaert was familiar with the Scott line through trade shows and stated that Scott homes were comparable in price and quality with Magnolia, both manufacturing some "Cadillacs" and some "Chevrolets" in the mobile home line.

---

**2.** This is the same vendor's privilege Mr. Gibbons relies on in the case at bar to support his defense that AAC was not damaged by Mr. Gibbons' conduct because AAC's vendor's privilege outranked ITT's collateral chattel mortgages.

### XX.

AAC paid the law firm of Blank, Rome, Comiskey & McCauley the sum of $90,055.43 to prosecute the Pennsylvania lawsuit.

### XXI.

AAC paid Deutsch, Kerrigan and Stiles the sum of $35,706.76, two-thirds of which was compensation for the intervention in the Lake Charles litigation and the prosecution of the Pennsylvania litigation.

### XXII.

The invoices on the mobile homes which were in Luneau's possession at the time of its default in March, 1984 total $677,061.00.

### XXIII.

Luneau's indebtedness to AAC in March, 1984 exceeded the invoice value of the mobile homes. As of March 19, 1984, Luneau owed AAC $707,490.60. By January 31, 1985, interest charges had increased Luneau's debt to AAC to $799,603.25. By January 31, 1986, the debt had increased to $911,437.64.

### XXIV.

AAC's claim for damages assigned to Scott consists of $677,000.00 less ten percent, or $609,300.00, plus $90,055.43 in attorney's fees paid to Blank, Rome, Comiskey & McCauley, plus two-thirds of $35,706.76, or $23,804.51, paid to Deutsch, Kerrigan and Stiles, less a credit of $97,244.05 which AAC received from the auction, for a claim of $625,915.89.

### CONCLUSIONS OF LAW

### I.

This Court has jurisdiction over this action pursuant to 28 U.S.C. section 1332. The substituted plaintiff, Scott, is a resident of the State of Georgia. Elmer Gibbons, III, a Professional Law Corporation, and Elmer Gibbons, III are residents of the State of Louisiana. Imperial Casualty & Indemnity Company is a resident of the State of Nebraska. There is complete diversity of citizenship between the parties and the controversy exceeds ten thousand dollars ($10,000.00), exclusive of interest and cost.

### II.

To prevail on its claim for legal malpractice under Louisiana law, Scott must prove that AAC had an attorney-client relationship with Mr. Gibbons, that Mr. Gibbons was negligent in his representation of AAC, and that his negligence was a proximate cause of the damage sustained by AAC. *See Evans v. Detweiler*, 466 So.2d 800, 802 (La.App. 4th Cir.1985).

### III.

It is not disputed that an attorney-client relationship existed between AAC and Mr. Gibbons.

### IV.

"An attorney is obligated to exercise at least that degree of care, skill, and diligence which is exercised by prudent practicing attorneys in his locality." *Ramp v. St. Paul Fire and Marine Insurance Company*, 269 So.2d 239, 244 (La.1972).

### V.

Mr. Gibbons breached his duty of care to plaintiffs by failing to record the collateral chattel mortgage dated August 11, 1988 with the Louisiana Department of Public Safety, Office of Motor Vehicles, as required by La.R.S. 32:710, to preserve AAC's lien on the mobile homes against third parties, and by failing to execute an assignment of Scott's vendor's lien on the homes to AAC.

### VI.

At the time Mr. Gibbons drafted the collateral chattel mortgage, La.R.S. 32:710 provided that "... the sole and exclusive method of executing and recording chattel mortgages and the priority of such mortgages which are subject to this Chapter, shall be through compliance with the provisions of this Chapter." The statute had

been amended in 1975 to bring mobile homes within its purview:

> The term "vehicle" shall include those devices sometimes referred to as mobile homes, whether or not they may be required to be registered or licensed under other laws, and except as otherwise expressly provided herein, the provisions of this Chapter shall apply to the sale and mortgaging thereof.

Acts 1975, No. 409. The statute further provided that a collateral chattel mortgage received and validated by the secretary of the Department of Public Safety "shall be superior in rank to any privilege or preference arising subsequently thereto." La.R. S. 32:710(B)(1)(c). Thus had Mr. Gibbons properly recorded the collateral chattel mortgage or perfected an assignment of Scott's vendor's lien, either security device would have primed ITT's subsequently recorded collateral chattel mortgage.[3]

## VII.

The negligence of Mr. Gibbons was a proximate cause of the harm suffered by AAC. Scott refused to buy back the homes because AAC did not have a first lien on the homes as was contemplated by Scott at the time the buy back agreement was executed. AAC incurred $90,055.43 in litigation costs to enforce the buy back agreement. In addition, Mr. Gibbons's negligence prevented AAC from foreclosing on the homes through executory process. Instead, AAC had to intervene in the Lake Charles litigation to enforce a purported assignment of a vendor's lien from Scott to AAC. Consequently, AAC incurred $23,-804.51 in attorneys fees to intervene in the Lake Charles litigation and lost $512,055.95 on the sale of the homes.

## VIII.

■ The Court declines to accept the election of remedies defense advanced by Mr. Gibbons. Mr. Gibbons was retained to prepare three security instruments: a collateral chattel mortgage on the Scott homes sold to Luneau, as assignment of a vendor's lien from Scott to AAC, and a Louisiana sale and mortgage. Two of these security devices were negligently perfected: the collateral chattel mortgage was not filed with the Louisiana Department of Public Safety, Office of Motor Vehicles, as is required to secure its rank against third parties. The assignment of Scott's vendor's privilege was never perfected as it was not signed by the vendor. The present suit does not involve the election of two inconsistent remedies. *See e.g.* *Gulf Shipping v. McQuilling*, 430 So.2d 1322 (La.App. 5th Cir.1983). Rather, it is a legal malpractice action for negligent preparation and recordation of security instruments. The doctrine of election of remedies merely provides that "[w]here the law furnishes a party with two or more concurrent consistent remedies, he may prosecute one or all until satisfaction is had; ...." *Id.* at 1326.

Because of the negligence of Mr. Gibbons, AAC could not utilize the security devices to seize the collateral for the loan issued to Luneau. Accordingly, AAC seeks to be made whole by filing this malpractice action against the attorney that was the proximate cause of its damages.

## IX.

Scott, as substituted plaintiff, is legally, lawfully and for good consideration the assignee and owner of all of AAC's claims against Mr. Gibbons for malpractice. As subrogee, Scott is entitled to recover against Gibbons and his insurer that amount which AAC would have been able to recover against Gibbons had it not sold and assigned its rights to Scott. *See* La. Civ.Code Art. 2642, *et seq.*

---

**3.** The same result would be reached under the Chattel Mortgage Statute, La.R.S. 9:5351, *et seq.*, and in particular, 5354.1, which provided:

*Notwithstanding any other law to the contrary,* a recorded collateral chattel mortgage created as security for the financing, in whole or in part, of any masses, assemblages, stocks of merchandise, movable property in bulk but changing in specifics of inventory pursuant to R.S. 9:5351 or of motor vehicle floor plan loans pursuant to R.S. 32:710 shall be superior in rank to a vendor's privilege that originates from a sale to the dealer that takes place after the time the collateral chattel mortgage is recorded.

## X.

Accordingly, IT IS ORDERED that judgment be rendered in favor of Scott and against the named defendants in the sum of $625,915.89 with legal interest from date of judicial demand and for all costs.

## ON MOTION FOR NEW TRIAL OR TO AMEND THE JUDGMENT

Defendants' motion for new trial or alternatively, to amend the judgment is based in large part upon a legal theory which was not previously argued to the Court. Defendants allege that Gibbons and Scott are solidary co-obligors and that the settlement between Scott and AAC extinguished AAC's right to recover from Gibbons, since AAC did not expressly reserve its right against the solidary co-obligors who were not parties to the release. Defendants also allege that the Court erred in awarding plaintiffs $90,055.43 in attorney's fees incurred by AAC in Pennsylvania to enforce the buy back agreement since Mr. Gibbons did not draft that document. Defendants next argue that the Court erred in using the testimony of Mr. Mike Cappaert to value the mobile homes as of March 1984, the date of Luneau's default, because AAC was unable to seize the homes at or near the time Luneau defaulted. Finally, defendants request that the Court declare the date of judicial demand from which interest shall accrue is October 24, 1986, the date this malpractice action was converted from a declaratory action to a complaint for monetary damages. The Court will address each of these issues consecutively.

Defendants contend that the law regarding solidary liability as it existed in 1984 applies to this case.[1] Louisiana Civil Code Article 2091 (1984)[2] defines solidary liability as follows:

There is an obligation in solido on the part of the debtors, when they are all obliged to the same thing, so that each may be compelled for the whole, and when the payment which is made by one of them, exonerates the others toward the creditor.

Thus, defendants argue, when debtors are commonly bound to the creditor for the performance of an obligation, and each obligor can be compelled to perform the whole debt, then solidary liability exists to the extent of their common debt. Applying this principle to the case at bar, defendants allege that, if Gibbons was negligent in failing to secure Luneau's debt to AAC, Gibbons is liable as a tortfeasor for the damages AAC sustained by not obtaining a first lien on the mobile homes. Luneau is liable for the full amount of its debt to AAC, $887,458.67, based on the promissory note it signed and pledged to AAC to secure Luneau's loan for the purchase of the mobile homes. Scott is liable for the full amount of Luneau's debt based on a contract wherein Scott agreed to reimburse AAC for Luneau's debt in the event Luneau defaulted on the loan. Defendants argue that even though Gibbons is not liable to the full extent of Luneau or Scott, there is an in solido obligation as to their common liability to AAC. The critical element which creates solidarity, is the coextensiveness of the obligations for the same debt, and not the source or the extent of liability. *See Narcise v. Illinois Central Gulf Railroad Co.*, 427 So.2d 1192, 1195 (La.1983). Gibbons, Luneau, and Scott are each liable for certain damages sustained by AAC because of Luneau's default. Accordingly, defendants contend that these parties are liable in solido.

Defendants maintain that AAC's settlement with Scott released all other solidary co-obligors because AAC did not expressly reserve its rights against the remaining solidary co-obligors. La.Civ.Code Art. 2203 (1984)[3] provides:

---

1. In 1984, the Louisiana Civil Code Articles on Obligations cited in this opinion were amended effective January 1, 1985. Except for new C.C. 1803, the new articles cited herein reproduce the substance of the former articles without changing the law.

2. The corresponding article in the 1988 Civil Code is Article 1794.

3. The corresponding article in the 1988 Civil Code is Article 1803. The new article "changes the law insofar as it establishes that remission of debt in favor of one obligor does not extinguish the solidary obligation, but only reduces it

The remission or conventional discharge in favor of one of the co-debtors *in solido,* discharges all the others, unless the creditor has expressly reserved his right against the latter.

In the latter case, he can not claim the debt without making a deduction of the part of him to whom he has made the remission.

The compromise agreement between AAC and Scott does not contain an express reservation of rights against the other solidary co-debtors. Consequently, defendants believe that Scott's payment to AAC relieved the other solidary co-obligor of their liability to AAC.

Plaintiff argues that the law of conventional subrogation, not the law of solidary obligations, governs this dispute. Plaintiff believes defendants' argument is irreconcilable with the law of assignment, conventional subrogation, and even some theories of legal subrogation.

Scott, the substituted plaintiff, points out that it was a *surety* for the Luneau debt. As a surety, Scott was solidarily obligated with Luneau to AAC for the entire amount of Luneau's debt. Consequently, Scott was also *legally subrogated* against Luneau. *See* La.Civ.Code Arts. 1825, 1826, and 1829. AAC was a creditor who coincidently had a negligent attorney, Elmer Gibbons. Because Mr. Gibbons failed to properly record AAC's collateral chattel mortgage, AAC's position as a creditor and Scott's position as a surety regarding the distribution of proceeds from the sale of the mobile homes were impaired. Scott elected to pay AAC the sum of $575,000.00 to satisfy AAC's claim against Scott, the surety. Because Scott and Gibbons are not solidarily liable, Scott obtained a *conventional subrogation* from AAC whereby Scott could recover from Gibbons the amount that AAC could have recovered from Gibbons due to his legal malpractice. *See* La.Civ.Code Arts. 1825 to 1827.

According to Scott, defendants' conclusion that Luneau, Scott, and Gibbons are all solidarily bound to AAC for the debt of Luneau is fallacious. *See e.g., Christy v. First National Bank of Commerce,* 289 Ark. 287, 711 S.W.2d 779 (1986). There is not, nor was there ever, a common debt between Scott and Gibbons or between Luneau and Gibbons.

Scott believes its position as a surety for AAC is similar to an insurer who, having paid the insured for the damages the insured sustained, obtains a subrogation of the insured's claim against the tortfeasor. *See eg., Comeaux v. Roy,* 469 So.2d 478 (La.App. 3rd Cir.1985). Though the insurer and the tortfeasor are both liable for the same debt, the amount of damages the insured sustained, they are not solidary co-obligors and the insurer's payment to its insured does not extinguish the tortfeasor's liability.

■ The Court finds that Gibbons and Scott are not solidary co-obligors because they are not liable for "the same thing" within the meaning of La.Civ.Code Art. 2091 (1984). Louisiana Civil Code Article 2093 (1984)[4] sets forth the following principle:

> An obligation *in solido* is not presumed; it must be expressly stipulated. This rule ceases to prevail only in cases where an obligation *in solido* takes place of right by virtue of some provisions of the law.

It has been said that the broadest "provisions of the law" which create solidary liability is found in Civil Code Art. 2091 (1984), which provides that "payment by one debtor in solido exonerates all." *Wheelahan v. Eller,* 446 So.2d 442, 447 (La.App. 4th Cir.1984) (Redmann, Chief Judge, Concurring), *writ denied,* 447 So.2d 1073 (La. 1984).

The Court finds Judge Redmann's concurring opinion in *Wheelahan* dispositive of the issue at bar. The question presented in *Wheelahan* was whether a medical insurer who seeks reimbursement for medi-

---

for the other obligors in the amount of the remitted share." La.Civ.Code Art. 1803, Comment (a).

4. The corresponding article in the 1988 Civil Code is Article 1796.

cal expenses paid to its insured is legally subrogated to its insured against the tortfeasor. The answer to this question depended upon whether the insurer and the tortfeasor were solidary co-obligors. Addressing the issue of solidarity, Judge Redmann wrote:

> Two persons may be debtors to the same creditor and for the same number of dollars without being bound in solido, even when their liability arises in part out of the same event. The death of one person may cause two different life insurers to owe, say, $500,000 each to the decedent's surviving spouse. Yet, evidently, what is owed by each is not "the same thing," art. 2091, despite their measure's being the same; perhaps more immediately evident, payment by one life insurer does not "exonerate" the other, does not discharge the other's liability towards the beneficiary.
>
> The same death might also oblige the person whose fault caused the death to owe the surviving spouse damages, C.C. 2315. Let us assume that a jury fixes those damages at $1,000,000. That is the same *amount* that the insurers owe, but it is not "the same thing," and payment by either tortfeasor or insurer does not exonerate the other.
>
> To hold to the contrary—to hold that C.C. 2091 makes the victim's insurer and the tortfeasor co-obligors in solido— would mean that by [legal] subrogation under C.C. 2161(3) both tortfeasor and insurer would escape 50% (C.C. 2103), or else one of them escapes 100% (C.C. 2106), of their "solidary" liability (assuming both are solvent). As to the tortfeasor, it is simply inconceivable that C.C. 2091 thus requires the victim's own insurance to relieve the tortfeasor of liability....

*Id.* at 446. *See also Lipps v. Bernstein*, 508 So.2d 178 (La.App. 4th Cir.1987), *rev'd on other grounds*, 512 So.2d 426 (La.1987).

Likewise, it is inconceivable to the Court that Gibbons should be relieved of liability for his negligence to his client, AAC, simply because AAC assigned its malpractice claim to the surety that it had obtained for the Luneau transaction. Furthermore,

Scott merely reimbursed AAC for payments AAC had made to Luneau. As explained by Judge Redmann, this fact weighs against a finding of solidarity:

> To decide whether one debtor's payment exonerates the others involves several considerations.... Surely, ... double recovery ... [is] not deemed socially desirable. Perhaps a more significant consideration ... is whether one debtor's payment is akin to a mere restoration to the creditor of his or her own money,....

*Id.* at 447.

The Louisiana Supreme Court, in an opinion on solidary obligations, recognized that these code articles should be construed with reference to other provisions in the Civil Code:

> Care should be taken by civilian attorneys and jurists to be on guard against applying one segment of the code in isolation from others. Neither the Civil Code nor the revised statutes were intended to be applied in this manner.

*Hoefly v. Government Employee Ins. Co.*, 418 So.2d 575, 580 (La.1982). A finding by this Court that Gibbons and Scott are solidary co-obligors would be irreconcilable with the law of conventional subrogation.

The Court requested briefs on the issue of solidary obligations to avoid granting AAC a double recovery. However, it is the opinion of the Court that Gibbons and Scott are not solidary co-obligors because they are not liable for "the same thing" within the meaning of Civil Code Art. 2091 (1984). Scott was simply a surety in a commercial transaction. The suretyship was disputed and, in order to compromise the alleged suretyship obligation, the parties accepted a subrogation of AAC's malpractice claim against Gibbons.

■ Defendants next argue that they are not responsible for the $90,055.43 in attorney's fees incurred by AAC to enforce the buy back agreement because Mr. Gibbons did not draft that document and had nothing to do with that transaction. The Court does not accept defendants' argument and will not reverse its award for the attorney's fees incurred by AAC in Penn-

sylvania. The records of the Pennsylvania litigation reflect that the central issue in that case was whether Scott was obligated to buy back the homes since AAC had failed to secure a first lien on the homes. In addition, the testimony at trial was undisputed that the sole reason for Scott's failure to comply with the terms of the buy back agreement was AAC's failure to secure a first lien. AAC's inability to obtain this rank was caused solely by the fault of Mr. Gibbons. He did not properly record AAC's collateral chattel mortgage, enabling ITT to obtain a higher ranking lien. Though Judge Shapiro held that, under the terms of the buy back agreement, Scott was unconditionally bound to repurchase the homes, the controversy at issue in the Pennsylvania litigation was caused by Mr. Gibbons' failure to record AAC's collateral chattel mortgage in a manner which would secure to AAC a first lien on the homes. Thus, the attorney's fees incurred in Pennsylvania are an item of damages AAC sustained as a result of its attorney's negligence.

Defendants also allege that the Court erred in estimating that resale value of the mobile homes was the original purchase price of the homes, less ten percent. Defendants state that whereas Mr. Mike Cappaert, who worked for Magnolia, was able to seize the Magnolia homes on Luneau's lots and sell them via executory process within one month of Luneau's default; AAC could not. Defendants believe the testimony showed that immediate repossession was not possible. Thus, defendants claim it was Luneau's hostility, not Mr. Gibbons' alleged negligence, which prevented AAC from foreclosing on the mobile homes through executory process. Accordingly, defendants maintain that Mr. Gibbons' conduct only affected the ranking of the liens and, hence, the manner in which the proceeds of the judicial sale were disbursed.

The Court recognizes that the delay in repossessing the mobile homes was caused in part by Luneau, a non-party, having moved the homes to avoid seizure. However, Herschel Adcock, Esq., counsel for ITT and formerly counsel for AAC, stated that the major delay in the sale of the homes was AAC's claim of a vendor's privilege over most of the homes. AAC raised the defense of a vendor's privilege because Mr. Gibbons did not secure for AAC a first lien on the homes. The Court finds from the totality of the evidence that the primary and proximate cause of the delay was the dispute over which party, AAC or ITT, had priority over the homes and that this dispute was caused by Mr. Gibbons' negligence.

■ Furthermore, defendants did not present evidence to value the homes as of April 27, 1984, the date the Court learned, from reading the record of the Lake Charles litigation, on which the Scott mobile homes were seized. Once plaintiff established Mr. Gibbons' negligence and set forth its claim for damages, it was defendants' burden to present evidence establishing the value of the homes on an alternate date which was more favorable to defendants' case.

■ Finally, defendants contend that if they are found liable, legal interest on the judgment should run from October 24, 1986, the date this malpractice action was converted from a declaratory judgment action to a complaint for monetary damages. The Court finds defendants' request meritorious and, under the authority of *Livingston v. Southern Scrap Material Co.*, 486 So.2d 210 (La.App. 1st Cir.1986), will grant same.

Accordingly,

IT IS ORDERED that defendants' motion for a new trial or alternatively, to amend judgment is DENIED.

IT IS FURTHER ORDERED that the date of judicial demand from which legal interest shall accrue is OCTOBER 24, 1986.

Accordingly, judgment is rendered in favor of plaintiff, Scott Housing Systems, Inc., and against the named defendants in the sum of $609,300.00, (the resale value of the mobile homes near the time Luneau defaulted), plus $90,055.43 in attorney's fees paid to Blank, Rome, Comiskey & McCauley to enforce the buy back agree-

ment, plus two-thirds of $35,706.76, or $23,-804.51, paid to Deutsch, Kerrigan and Stiles for legal fees incurred in the Lake Charles litigation, less a credit of $97,-244.05 which AAC received from the auction, for a claim of $625,915.89, together with legal interest from October 24, 1986 until paid and all costs.