|2CARTER, Judge.
This is an appeal from a trial court judgment in an action for damages arising out of an action for legal malpractice.

FACTS

On August 4, 1983, Seaborn R. Wicker, Jr. and Jean Brown Wicker[1] purchased from Kent A. Howard and Karen Smith Howard a tract of land in the Parish of East Baton Rouge. The Act of Cash Sale recited a cash consideration of $160,000.00. However, only $60,000.00 in cash had been paid, and the Howards permitted the Wickers to substitute a $100,000.00 promissory note for the remaining cash consideration. The promissory note, executed by the Wickers, was made payable to the Howards. The promissory note stipulated an interest rate of 10.8% and was payable in fifty-nine monthly installments of $900.00, beginning September 4, 1983, with the balance due on August 4,1988. The $100,000.00 promissory note was secured by the collateral pledge of three mortgage notes. The collateral pledge agreement was executed by Realty Mart, Inc.[2] and the Wickers, before two witnesses and M. Aubrey McCleary, Jr. (McCleary), notary public, and pledged three mortgage notes, as follows:
(1) One certain mortgage note, dated May 4, 1981, in the sum of $31,000.00, made by Roosevelt Bryant and Katie Burnett Bryant, payable in monthly installments to Realty Mart, Inc. at American Bank and Trust Company, stipulating an annual interest rate of 10.75% from date until paid. The note was paraphed for identification with an act of sale with mortgage on an East Baton Rouge Parish tract of land, executed by the Bryants and recorded as Original 321, Bundle 9432 of the official records of East Baton Rouge Parish. (This note is hereinafter referred to as the Bryant note.);
(2) One certain mortgage note, dated May 12, 1981, in the sum of $40,400.00, made by Burtin Joseph Schexnaydre, Jr. and Cynthia Laughlin Schexnaydre, payable in monthly installments to Realty Mart, Inc. at American Bank and Trust Company, stipulating an annual interest rate of 12% from date until paid. The note was paraphed for identification Iswith an act of sale with mortgage on an Ascension Parish tract of land, executed by the Schexnaydres and recorded as Original 302, Bundle 182714 of the official records of Ascension Parish. (This note is hereinafter referred to as the Schexnaydre note.); and,
*847 (3) One certain mortgage note, dated July 12, 1983, in the sum of $45,500.00, made by Robert L. Cannon and Julie Castro Cannon, payable in monthly installments to Realty Mart, Inc. at American Bank and Trust Company, stipulating an annual interest rate of 12% from date until paid. The note was paraphed for identification with an act of sale with mortgage on a Livingston Parish tract of land, executed by the Cannons and recorded in the official records of Livingston Parish. (This note is hereinafter referred to as the Cannon note.)
At the time of the closing, McCleary failed to paraph the three mortgage notes “Ne Varietur” for identification with the collateral pledge agreement. The Howards did not take possession of the three pledged mortgage notes; the notes remained in the custody of American Bank and Trust Company.
On October 14, 1985, the Cannons (the mortgagors on the Cannon note) executed a “Dation En Paiement,” transferring the Livingston Parish property to Realty Mart, Inc. The dation was executed before McCleary, who canceled the Cannon note and delivered it to the Cannons, thereby discharging them from the indebtedness secured by the mortgage and mortgage note previously pledged to the Howards. The following day, October 15, 1985, by act of sale with assumption of mortgage, Realty Mart, Inc. transferred the Livingston Parish property to Edgar Neal and Linda Grimes Jeter for $47,295.34.[3]
On October 7,1987, the Howards discovered that the Cannon note had been canceled and that the property securing the note had been released. Thereafter, on February 23, 1988, the Howards filed an action for “Monies owed, Damages, and Writ of Sequestration.” Named as defendants in the Howards’ petition were: the Wickers, McCleary, and McCleary’s professional liability insurers, National Union Fire Insurance ^Company[4] and New England Insurance Company. The Howards alleged that the delivery and cancellation of the Cannon note pledged as security for the Wickers’ $100,000.00 note was a breach of McCleary’s fiduciary obligation. The Howards specifically alleged that McCleary, as an attorney and notary public, breached his fiduciary duty to them in that he failed to paraph the three mortgage notes “Ne Varietur” for identification with the collateral pledge agreement.[5] The Howards alleged that, if the Cannon note had been timely paraphed, the note would not have been canceled and the property securing the note would not have been released without the substitution of other security of equal value. The Howards’ petition further alleged that the Wickers breached their fiduciary relationship when they (1) obtained the note and delivered it to the Cannons and (2) accepted the dationed property and permitted McCleary to cancel the note. The Howards further alleged that the Wickers failed to pay interest installments due on the $100,000.00 note since May 4, 1987, and that the note provides for annual interest of 10.8%, payments of $900.00 per month on the 4th of each month commencing September 4, 1983, and attorney’s fees in the amount of 25% on principal and interest.
With regard to their claims for breach of fiduciary responsibility against McCleary and the Wickers, the Howards alleged that they were damaged in that they were deprived of security in the amount of $45,500.00 on the Wickers’ $100,000.00 indebtedness to them. With regard to the Howards’ demands on the $100,000.00 promissory note, the Howards requested payment of the full amount of the $100,000.00 note, plus interest from the last *848 payment, as well as 25% attorney’s fees. The Howards also requested the issuance of a writ of attachment for the seizure of the Bryant and Schexnaydre notes and recognition of their security interest in the pledged notes.
On July 13, 1988, New England Insurance Company and McCleary filed a cross-claim against the Wickers, as makers of the $100,-000.00 promissory note to the |sHowards, for the full amount of any judgment rendered against them on the main demand.
On July 14, 1989, the Howards filed a motion for summary judgment against the Wickers for payment of the $100,000.00 promissory note, interest at 10.8% per an-num, and 25% attorney’s fees. On October 3, 1989, the trial court signed a judgment, granting the Howards’ motion for summary judgment and finding the Wickers hable for the sum of $100,000.00, together with interest at 10.8% per annum from May 4, 1987, until paid, and for all costs and attorney’s fees of $5,000.00.
The Bryant and Schexnaydre notes were seized under a writ of fieri facias.[6] The Howards subsequently learned that the Bryants and Schexnaydres had been making payments on the notes to Hancock Bank[7] for the account of Realty Mart, Inc. and the Wickers. The bank, in turn, converted the payments to cashier’s checks made payable to Realty Mart, Inc. and the Wickers. However, the bank was unable to locate the Wickers, and some of the cashier’s checks were returned as undeliverable. On October 4, 1991, the Howards filed a petition for garnishment against Hancock Bank. On December 21, 1992, the Howards received $12,-232.56 of the funds held by Hancock Bank for application to the judgment against the Wickers.
On January 14,1994, the matter proceeded to trial against McCleary and New England Insurance Company[8] for the damages caused by the wrongful cancellation of the Cannon note. At the conclusion of the trial, the court rendered judgment, on the main demand, in favor of the Howards and against McCleary and New England Insurance Company in the amount of $21,473.95 (the amount that the Wickers netted from the resale of the Cannon property to the Jeters), plus interest and costs. The judgment provided that these sums were to be credited against the judgment previously rendered | ¡¡against the Wickers pursuant to the summary judgment. The trial court also rendered judgment, on the cross-claim, in favor of New England Insurance Company and McCleary and against the Wickers in the amount of $21,473.95, plus interest and costs.
From this adverse judgment, the Howards appealed, alleging that the trial court erred in failing to hold the attorney/notary liable for the full value of the pledged property.

DISCUSSION

In a malpractice action against an attorney, the client is entitled to such damages as result from the error, negligence, or dereliction involved. Capital Bank & Trust Company v. Core, 343 So.2d 284, 288 (La. App. 1st Cir.), writ not considered, 345 So.2d 61, writ denied, 345 So.2d 504 (La.1977); See Gill v. DiFatta, 364 So.2d 1352, 1356 (La. App. 4th Cir.1978). Such damages are discussed in 7A C.J.S., § 273, as follows:
Actual damages may be recovered by a successful client in an action against an attorney for legal malpractice or negligence. The remedy is limited to one award of money damages, and the measure of damages is the amount of loss actually sustained as a proximate result of the conduct of the attorney. So, items of damage sustained by a client which are not attributable to his attorney’s negligence are not recoverable, and a client may not *849 recover from the attorney in the absence of any damage, (footnotes omitted) (emphasis added).
In American Acceptance Corporation v. Elmer G. Gibbons, III, Inc., 704 F.Supp. 684 (E.D.La.1988), affirmed, 881 F.2d 1072 (5th Cir.1989), the attorney failed to perfect a collateral chattel mortgage to secure the debt on certain mobile homes, which had been sold by the manufacturer to the dealer and financed by a financial institution. The attorney drafted a collateral chattel mortgage, a promissory note, and an act of pledge in favor of the financial institution, which were executed by the dealer. The attorney failed to record the collateral chattel mortgage properly. When the financial institution became concerned about the dealer’s ability to pay its obligations, the attorney drafted a sale and mortgage, whereby the financial institution sold the mobile homes to the dealer, and the dealer, in return, mortgaged the homes to the financial institution. The financial institution also reserved a vendor’s lien and privilege. Like the collateral chattel ^mortgage, the sale and mortgage were not recorded properly. The dealer also obtained credit from a finance company and secured the financing with two collateral chattel mortgages, which were recorded properly. When the dealer defaulted on its loans, the finance company’s liens primed the financial institution’s liens. In the financial institution’s suit against the attorney for malpractice, the court held that the financial institution was entitled to damages equal to the value of the mobile homes which served as collateral, rather than the full amount of the note held by the financial institution.
In the instant case, we find that the Howards are entitled to damages for the amount of loss actually sustained as a result of McCleary’s failure to paraph the note and his cancellation of the note to the Wickers and subsequent resale of the mortgaged property. The evidence reveals that the Cannon note, in the face amount of $45,-500.00, was subject to a first mortgage. If the Howards had foreclosed upon the Cannon note as security for the Wickers’ indebtedness, they would have been required to satisfy the first mortgage before they could have seized the mortgaged property. The equity remaining from the sale of the property after satisfaction of the first mortgage represents the portion of the Cannon note which was secured by the second mortgage. When the Wickers sold the property to a third party, the equity in the property, which was the Howards’ secured portion of the Cannon note, was established. The net proceeds received by the Wickers, or $21,473.95, is the secured portion of the Cannon note which the Wickers could have recovered through foreclosure on the Cannon note. The Howards failed to present any evidence that the value of the lost security interest exceeded $21,473.95. Therefore, we find that the trial court correctly determined that the Howards are entitled to only $21,473.95, the amount the Wickers realized from the Cannon dation and resale of the property.

CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed in all respects. The Howards are cast for all costs.
AFFIRMED.

. On December 5, 1983, Jean Brown Wicker executed a power of attorney, giving her husband, Seaborn R. Wicker, Jr., power to appear and act on her behalf, including the sale of immovable properly. In the documents executed in connection with the sale of the property to the Wickers, Seaborn R. Wicker, Jr. appeared personally and as agent for Jean Brown Wicker.

. Seaborn R. Wicker, Jr., as president of Realty Mart, Inc., executed the Collateral Pledge Agreement on behalf of the corporation.

. The consideration recited in the act of sale with assumption of mortgage revealed that the Jeters paid $22,000.00 cash and assumed a $25,295.34 balance on a $28,000.00 promissory note, dated March 29, 1977, bearing an interest rate of 8%, executed by Ray Gilbert Riley, et ux to the order of Carruth Mortgage Corporation.

. National Union Fire Insurance Company of Pittsburg, Pennsylvania (National Union) answered the Howards' petition, denying the allegations set forth therein. National Union acknowledged that it had issued a policy of professional liability insurance for the policy period between January 14, 1987, and January 14, 1988. The policy was a claims-made policy and covered any acts or omissions for which claims were made during the policy period. The How-ards' claim was made outside the policy period.

.The Bryant and Schexnaydre notes were par-aphed on November 24, 1987.

. The notes were advertised for sale. The first sale did not bring a bid of ¾ of the notes’ appraised value. Thereafter, the notes were re-advertised for sale and were purchased by the Howards for costs.

. Hancock Bank’s predecessor was American Bank and Trust Company.

. Although National Union was named in the Howards' initial pleadings, no further proceedings were conducted against National Union. However, the record does not contain a judgment of dismissal.